*Decisions will be entered under Rule 155.*

ESTATE OF CATHERINE E. COON, DECEASED, FRANK J. COON, ADMINISTRATOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5758–81.    Filed September 22, 1983.

*Sam Harrod III*, for the petitioner.
*Michael W. Bitner*, for the respondent.

COHEN, *Judge*: In a statutory notice of deficiency dated December 30, 1980, respondent determined a deficiency in the amount of $98,916.30 in estate taxes due from petitioner estate. After concessions, the sole issue for resolution is whether, during the 8-year period ending on the date of decedent Catherine E. Coon's death, there were periods aggregating 5 or more years during which the decedent or a member of decedent's family "materially participated" in the operation of certain farm property within the meaning of section 2032A(e)(6).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect at the date of death.

Catherine E. Coon (decedent) died intestate on April 4, 1977. Frank J. Coon (petitioner), decedent's brother, is the administrator of decedent's estate and resided in Chillicothe, Ill., at the time the petition herein was filed. Petitioner timely filed an estate tax return and an amended estate tax return for the estate of decedent with the Internal Revenue Service Center, Springfield, Ill.

Decedent originally acquired an interest in certain real property (the farmland) located in Peoria County, Ill., upon the death of her father in 1950. At that time, the property consisted of several farms operated by tenant farmers pursuant to crop-share leases. On March 8, 1951, decedent and her fellow owners of the farmland (the landlords) entered into an agreement whereby petitioner Frank J. Coon was appointed attorney-in-fact and agent on behalf of the landlords in managing that property. Upon the death of her mother in 1962, decedent's ownership of the farmland increased to a one-third undivided interest, the interest held by her at the date of her death.

At the time of decedent's death, the farmland consisted of three farms (hereinafter referred to as No. 1, No. 2, and No. 3) that were subject to crop-share leases executed by petitioner in the late 1950's on behalf of the landlords. Farms No. 1 and No. 2 were leased to Kenneth Fogg and Henry Foster, respectively. Both of these leases were executed on March 1, 1957, on a standard form provided by the University of Illinois Department of Agricultural Economics. The terms of these "1957 leases" were almost identical and included the following provisions:

ILLINOIS CROP-SHARE CASH FARM LEASE

Length of tenure

The term of this lease shall be from the 1st day of _March_, 19_57_, to the 1st day of _Mar_, 19_58_, and from year to year thereafter unless written notice to terminate is given by either party to the other, at least _Aug 1st_ months prior to the beginning of the succeeding lease year.

\*     \*     \*     \*     \*     \*     \*

## Section 1. Division of Crops, Cash Rent, and Other Rent Stipulations

\*     \*     \*     \*     \*     \*     \*

E. Each year that this lease remains in effect the two parties shall agree in writing upon the cropping system to be followed, and that agreement shall become a part of this lease for the year indicated.

\*     \*     \*     \*     \*     \*     \*

## Section 3. Tenant's Investment and Expenses

The Tenant agrees to furnish the property and to pay the items of expense listed below:

A. All the machinery, equipment, work horses, and labor necessary to farm the premises properly.

\*     \*     \*     \*     \*     \*     \*

## Section 4. Tenant's Duties in Operating Farm

In addition to the agreements covered by the foregoing articles of this lease, the Tenant further agrees that he will perform and carry out the following stipulations:

\*     \*     \*     \*     \*     \*     \*

U. To decide each year cooperatively with the Landlord whether to enter into Governmental programs designed to aid agriculture.

\*     \*     \*     \*     \*     \*     \*

## Section 6. Default, Compensation for Damage, Arbitration, Right of Entry

\*     \*     \*     \*     \*     \*     \*

D. Landlord's right of entry at any time. The Landlord reserves the right of himself, his employees, assigns, or prospective buyers, to enter upon said premises at any time for the purpose of viewing the same or making repairs or improvements thereon, or of plowing after severance of crops, or of seeding, or applying fertilizers, or for the care and disposition of the Landlord's share of the crops, the same not to interfere with the occupancy of the Tenant.

Farm No. 3 was leased to Paul Vonk. The lease was executed August 31, 1957, on a "revised" standard form provided by the University of Illinois Department of Agricultural Economics, and was effective beginning March 1, 1958. The only material difference between this "1958 lease" and the "1957 leases" was section 5 of the "1958 lease," which provided:

SECTION 5. MANAGEMENT AND BUSINESS PROCEDURES

The Landlord and Tenant agree that they will observe the following provisions. (Strike out any items not desired. Note that Clause B gives the Landlord an *opportunity for material participation* in management decisions. If such participation is not desired, strike out all or parts of this clause not to be used.)

A. Except when mutually decided otherwise (for example, modifications brought about by participation in government programs), the land use and cropping system shall be approximately as follows:

___ acres to be used for rotated crops

___ acres of tillable land planted to biennial or perennial legumes each year

___ acres to remain in permanent pasture

___ acres of tillable land to be left in biennial or perennial legumes each year

___ acres in nongrazed woodland

___ acres in buildings and lots

B. In the first year of this lease the following shall be the crops and varieties planted, and the fertility applied:

| Crop | Variety | Acres | Kind and amount of fertilizers to be applied |
|------|---------|-------|---------------------------------------------|
| First-year corn | | | |
| Second-year corn | | | |
| | | | |
| | | | |

For each succeeding year that this lease remains in effect, the two parties shall review Section 5, A and B, before the lease year begins, to decide upon (1) any changes in the cropping system, (2) varieties and acreages of each crop to be planted, and (3) kinds and amounts of fertilizer to be applied. *The Landlord shall counsel with the Tenant at appropriate intervals on the best time for planting, working, and harvesting crops.*

[Emphasis supplied.]

The portion of the "1958 lease" for specifying the cropping system (i.e., section 5.B.) was never completed, and no written agreement concerning the cropping system was ever executed between petitioner and any of the three tenants. The system of crop rotation had been established by decedent's father prior to 1950, and that pattern was generally followed by the tenants. Each year petitioner and the tenants discussed the

planned crops for the succeeding year, especially when major changes in the rotation system were contemplated.

From the time these leases were executed through the date of decedent's death, the facts concerning the actual operation of the farms remained virtually constant. The tenants were experienced farmers and most production decisions, including when to plow, fertilize, disk, plant, and harvest, were made without consulting petitioner. Petitioner was consulted regarding improvements or major repairs to the property.

The custom in Peoria County during the 8-year period preceding decedent's death was for the crop-share tenants to provide the production machinery used to plow, disk, plant and harvest, and such machinery was supplied by the tenants. The landlords provided some machinery used for storing the grain. At no time during this period did decedent or a member of her family utilize any of the farmland as their principal residence.

Petitioner was a full-time employee of the First National Bank of Chillicothe from 1948 through the date of decedent's death, and he performed no physical work on any of the three farms. In his capacity as attorney-in-fact and agent for the landlords, petitioner maintained detailed financial records concerning the landlords' income and expenses from the farmland and prepared an annual report. He employed Mr. Fogg to perform errands in connection with the farmland and to act as a liaison between him and the other two tenants. Mr. Fogg was not a typical farm manager in that he did not supervise the other two farms and his compensation was not based on farm production. Rather, he was more of a go-between through whom almost all communication between petitioner and the other tenants passed. Mr. Fogg had known petitioner since their childhood and they usually spoke with each other once or twice per week. For these services, petitioner paid Mr. Fogg compensation ranging from $750 in 1969 to $2,000 in 1979.

The three farms were located on regularly traveled roads, and on summer evenings, petitioner frequently drove these roads for the purpose of viewing the farms. Petitioner also drove to the farms following major storms and inspected the crops and land for damage.

Upon decedent's death in 1977, her interest in the farmland passed, pursuant to the laws of intestate succession of the State of Illinois, in equal undivided shares to her brother (petitioner) and her nephew, Frank Sturm. On behalf of decedent's estate, petitioner elected on both the original and the amended estate tax returns to specially value decedent's interest in farmland under the provisions of section 2032A. Petitioner also elected the alternate valuation date (6 months after the date of death) under the provisions of section 2032. The fair market value of her interest in the farmland (without consideration of special use valuation) on that date was $456,620. The "special use value" of that interest in the property was $197,790, and petitioner elected to use that value for estate tax purposes and filed an agreement as required by section 2032A(d).

Respondent determined that decedent's estate was not entitled to specially value the farmland because neither decedent nor a member of her family materially participated in the operation of the farm as required by section 2032A(b)(1)(C)(ii).

### OPINION

The pertinent provisions of section 2032A were adopted as a part of the Tax Reform Act of 1976, sec. 2003(a), Pub. L. 94–455, 90 Stat. 1856, in order to encourage the continued use of property for farming and other small business purposes by reducing the tax burden upon such property. H. Rept. 94–1380 (1976), 1976–3 C.B. (Vol. 3) 755, 756; S. Rept. 94–938 (Part 2) (1976), 1976–3 C.B. (Vol. 3) 657. The perceived unfortunate tax consequence resulted from valuing real property at its highest and best use rather than at its then-existing family use. This result occurred because the real property was in effect valued separate and apart from the going business or farm. See D. Kelly & D. Ludtke, Estate Planning for Farmers and Ranchers 642–643 (1980). The thrust of the 1976 statute is to allow taxes on estate property to be computed on an income capitalization method of valuation of "qualified" real property, rather than the traditional "fair market value" based on its highest and best use.

The tax relief provided by the statute, however, is limited in several ways. The decedent must have been a citizen or a

resident of the United States, and the subject property must be located in the United States. The real property must have been used as a farm or in a trade or business by the decedent or a member of the decedent's family, with "material participation" in the operation of the farm or the business by the decedent or a member of the decedent's family. Real property qualifies for special use valuation only if it passes to a qualified heir, who must be a member of the decedent's family. The ownership and use requirements must continue for 10 years after the decedent's death to avoid recapture of part of the tax savings resulting from special use valuation. Sec. 2032A(c). These requirements all express the intent of Congress to limit this particular form of tax relief to what would generally be regarded as a family farm or business. See *Estate of Geiger v. Commissioner*, 80 T.C. 484 (1983); *Estate of Cowser v. Commissioner*, 80 T.C. 783 (1983), on appeal (7th Cir., July 12, 1983).

The parties agree that the requirements of section 2032A other than the "material participation" requirement of section 2032A(b)(1)(C)(ii) have been met. Thus, the sole issue for determination is whether the decedent or a member of her family materially participated in the operation of the farmland.

Section 2032A(e)(6) provides, "Material participation shall be determined in a manner *similar to* the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment)." (Emphasis supplied.) On July 28, 1980, pursuant to authority granted by section 7805(a), the Secretary adopted interpretative regulations under section 2032A. Although such regulations were adopted after the date of decedent's death, assuming their validity, these regulations are applicable to decedent's estate. See *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129 (1936); sec. 7805(b).

The pertinent portions of section 20.2032A-3, Estate Tax Regs., provide:

Sec. 20.2032A-3. Material participation requirements for valuation of certain farm and closely-held business real property.

(a) *In general.* * * * Whether the required material participation occurs is a *factual determination*, and the types of activities and financial risks which will support such a finding will vary with the mode of ownership of both the

property itself and of any business in which it is used. * * *

\* \* \* \* \* \* \*

(e) *Required activities*—(1) *In general.* Actual employment of the decedent (or of a member of the decedent's family) on a substantially full-time basis (35 hours a week or more) or to any lesser extent necessary personally to manage fully the farm or business in which the real property to be valued under section 2032A is used constitutes material participation. * * * In the absence of this direct involvement in the farm or other business, the activities of either the decedent or family members must meet the standards prescribed in this paragraph *and* those prescribed in the regulations issued under section 1402 (a)(1). * * *

(2) *Factors considered.* No single factor is determinative of the presence of material participation, but physical work and participation in management decisions are the principal factors to be considered. As a minimum, the decedent and/or a family member must regularly advise or consult with the other managing party on the operation of the business. While they need not make all final management decisions alone, the decedent and/or family members must participate in making a substantial number of these decisions. Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the operation of the farm or other business in which the real property is used. In the case of a farm, the furnishing by the owner or other family members of a substantial portion of the machinery, implements, and livestock used in the production activities is an important factor to consider in finding material participation. With farms, hotels, or apartment buildings, the operation of which qualifies as a trade or business, the participating decedent or heir's maintaining his or her principal place of residence on the premises is a factor to consider in determining whether the overall participation is material. Retention of a professional farm manager will not by itself prevent satisfaction of the material participation requirement by the decedent and family members. However, the decedent and/or a family member must personally materially participate under the terms of arrangement with the professional farm manager to satisfy this requirement.

[Emphasis supplied.]

Petitioner contends that his participation in the management of the farmland was "material." Petitioner was not, however, actually employed in these farms on a substantially full-time basis; thus, we must consider the applicable factors set forth in section 20.2032A-3(e)(2), Estate Tax Regs.

Petitioner's participation in management decisions was generally limited to discussing with the tenants the planned crops for the succeeding year, directing the tenants where to purchase the landlord's share of the seed and fertilizer, and consulting with the tenants regarding improvements or major repairs to the property. At most, these decisions required

attention on an infrequent basis. Although petitioner did speak with his long-time acquaintance and liaison to the other two tenants, Mr. Fogg, once or twice per week, he has not established the extent, if any, to which advice or consultation regarding the actual operation of farms transpired during these conversations. All of the tenants were experienced farmers, and most of the actual *operating* decisions regarding the farms were made by them without advice from or consultation with petitioner. These decisions included such key decisions as when to plow, fertilize, disk, plant, and harvest. Based on the weight of the evidence, we conclude that petitioner did not regularly advise or consult the tenants regarding the operation of the farms and that he did not participate in a substantial number of final management decisions, as required by the regulations.

Petitioner frequently drove the roads adjacent to and dissecting the farmland on summer evenings and on some weekends. He also visited the farms following major storms to check for damage. The regulation, however, refers to the inspection of "production" activities. Production activities include plowing, disking, planting, and harvesting. It would require at best a strained interpretation to conclude that petitioner's viewing the farms on evenings and some weekends from an automobile and checking for damage following major storms constituted inspecting the production activities of the farms.

The lease agreements generally required the landlords to pay for one-half of the seed, the taxes on the land, and fire and wind insurance on the residence and all buildings used to store grain and machinery. Thus, the landlords did assume a substantial portion of the expense involved in the operation of the farms.

All of the production machinery used to plow, disk, plant, and harvest the farmland was provided by the tenants. Although the landlords did provide some grain storage machinery, this clearly was not a "substantial portion" of the machinery used for production. Petitioner argues that it was not the custom for landlords in Peoria County to furnish their crop-share tenants machinery used for production. Petitioner has not cited any authority suggesting that local customs are

significant in applying the regulations, and his argument with respect to them is not persuasive.

Based on the foregoing analysis of the factors specified in section 20.2032A-3(e)(2), Estate Tax Regs., we conclude that petitioner did not at any time relevant herein materially participate in the operation of the farmland. Petitioner argues, however, that the regulations under section 2032A are invalid to the extent that they "impose a higher standard of activity to accomplish material participation" than the regulations under section 1402(a)(1). This argument is predicated upon the language of section 2032A(e)(6) directing that material participation is to be determined in a manner "similar to" the manner used for purposes of section 1402(a)(1). Apparently petitioner interprets the "similar to" language to mean "identical to." We need not decide here, however, whether the regulations promulgated under section 2032A impose a higher standard of activity to qualify as material participation than that contemplated by Congress, because petitioner did not materially participate in the operation of the farmland within the meaning of section 1402(a)(1).

The pertinent part of section 1.1402(a)-4, Income Tax Regs., provides:

Sec. 1.1402(a)-4. Rentals from real estate.

(b) *Special rule for "includible farm rental income"*—(1) *In general.* Notwithstanding the rules set forth in paragraph (a) of this section, there shall be included in determining net earnings from self-employment for taxable years ending after 1955 any income derived by an owner or tenant of land, if the following requirements are met with respect to such income:

(i) The income is derived under an arrangement between the owner or tenant of land and another person which provides that such other person shall produce agricultural or horticultural commodities on such land, and that there shall be material participation by the owner or tenant in the production or the *management of the production* of such agricultural or horticultural commodities; and

(ii) There is material participation by the owner or tenant with respect to any such agricultural or horticultural commodity. Income so derived shall be referred to in this section as "includible farm rental income".

\* \* \* \* \* \* \*

(4) *Actual participation.* In order for the rental income received by the owner or tenant of land to be treated as includible farm rental income, not only must it be derived pursuant to the arrangement described in subparagraph (1) of this paragraph, but also the owner or tenant must actually participate to a material degree in the production or in the management of the production of any of the commodities required to be produced under the

arrangement, or he must actually participate in both the production and the management of the production to an extent that his participation in the one when combined with his participation in the other will be considered participation to a material degree. If the owner or tenant shows that he periodically *advises or consults* with the other person, who under the arrangement produces the agricultural or horticultural commodities, *as to the production* of any of these commodities and also shows that he periodically *inspects the production activities* on the land, he will have presented strong evidence of the existence of the degree of participation contemplated by section 1402(a)(1). If, in addition to the foregoing, the owner or tenant shows that he furnishes a substantial portion of the machinery, implements, and livestock used in the production of the commodities or that he furnishes or advances funds, or assumes financial responsibility for a substantial part of the expense involved in the production of the commodities, he will have established the existence of the degree of participation contemplated by section 1402(a)(1) and this paragraph.

[Emphasis added.]

Petitioner did not participate in the production of any of the commodities on the farmland. We must consider, therefore, whether he actually participated to a material degree in the "management of the production" of the commodities.

The major difference between the factors mentioned in this regulation and those specified in section 20.2032A–3(e), Estate Tax Regs., is that the latter regulation includes as a factor to be considered whether the participating decedent or heir maintained his principal place of residence on the premises. The evidence here is that: (1) Petitioner's advice to or consultation with the tenants regarding the operation of the farms was generally limited to discussing the succeeding year's planned crops and where to purchase the landlord's share of seed and fertilizer, and that petitioner did not consult with the tenants regarding most of the actual *production* decisions such as when to plow, fertilize, disk, plant, and harvest; (2) petitioner's frequent drives past and through the three farms and his visits to the farms following major storms were not equivalent to inspecting the *production* activities on the land; (3) the tenants furnished all machinery other than some grain storage machinery; and (4) the landlords assumed a substantial portion of the financial responsibility involved in producing the crops. Giving appropriate weight to each of these four factors, we hold that petitioner did not participate in the management of the production of the agricultural commodities to a material degree within the meaning of section 1.1402(a)-4(b)(4), Income Tax Regs.

The conclusion reached in this case is supported by the legislative history of the 1981 amendments to section 2032A. Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172. Effective for estates of decedents dying after December 31, 1981, the definition of "material participation" was *expanded* to include certain "eligible qualified heirs" who "actively managed" the farm or other business. Sec. 2032A(c)(7)(B). "Eligible qualified heirs" include the surviving spouse of the decedent and qualified heirs who are under the age of 21, disabled, or students. Sec. 2032A(c)(7)(C). The Senate Committee report defines "active management" as follows:

> Among the farming activities, various combinations of which constitute active management, are inspecting growing crops, reviewing and approving annual crop plans in advance of planting, making a substantial number of the management decisions of the business operation, and approving expenditures for other than nominal operating expenses in advance of the time the amounts are expended. Examples of management decisions are decisions such as what crops to plant or how many cattle to raise, what fields to leave fallow, where and when to market crops and other business products, how to finance business operations, and what capital expenditures the trade or business should undertake. [S. Rept. 97–144 (1981), 1981–2 C.B. 412, 464.]

In their most favorable light, petitioner's activities may be described as inspecting growing crops, approving annual crop plans, making some management decisions including what crops to plant, and approving major expenditures. Thus, petitioner may have "actively managed" the three farms. Active management, however, is a lesser standard of involvement than material participation. To argue otherwise would be to assume that section 2032A(c)(7)(B) is superfluous. Because decedent died prior to January 1, 1982, and because petitioner is not an eligible qualified heir, his assumed active management of the farmland does not qualify as material participation under the controlling law.

In summary, during the 8-year period ending on the date of decedent's death, neither decedent nor a member of her family "materially participated" in the operation of any of the three farms on the farmland within the meaning of section 2032A(e)(6). Because of concessions,

*Decision will be entered under Rule 155.*